STATE of Missouri, Respondent,

v.

Jack Edward NEWMAN, Appellant.

No. 61608.

Supreme Court of Missouri, Division One.

Sept. 9, 1980.

Rehearing Denied Oct. 15, 1980.

---

David Robards, Public Defender, Joplin, for appellant.

Paul R. Otto, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT R. WELBORN, Commissioner.

A jury in the Jasper County Circuit Court found Jack Edward Newman guilty of mur-

der in the first degree in the death of Burnal Ray Brown in the perpetration of a robbery. § 565.003, RSMo 1978. This appeal is from the ensuing judgment and sentence to life imprisonment.

Burnal Ray Brown, a resident of the Webb City area in Jasper County, made a practice of carrying on his person a considerable amount of cash in the form of a roll of bills, secured by a rubber band, and kept in the front pocket of his trousers. According to his wife, Brown usually carried from $1500 to $5000 in this fashion. On the morning of October 16, 1978, Mrs. Brown had seen her husband put such a roll of currency in his pocket.

At around 9:00 P.M., on October 16, 1978, Brown was in the Red Lion Lounge in Joplin. Don Van Hooser, an acquaintance of Brown's, asked Brown to cash a check for him. He gave Brown a check, signed by Van Hooser and made payable to "Cash" for $200.00. According to Van Hooser, Brown took a roll of bills from his front trouser pocket, took $200 from the roll and gave it to Van Hooser and returned the roll and check to his trouser pocket.

Brown called his wife from the Red Lion and asked her to pick him up there. She did so and they returned home around 9:00 P.M. Shortly after they got home, Mrs. Brown mentioned some difficulty about the spare tire on her car. Brown went out to examine it and when he returned, he brought a bank money bag containing a .38 caliber pistol which he had owned for some time. He remarked to his wife that he had forgotten that it was in the car and he placed the bag on a table in the den where he and his wife and his wife's father were watching television. Some 20 or 30 minutes after they got home, Brown received a telephone call from Junior Newman. Brown told Newman he could come out to the house or he would meet him anywhere. At 10:00 P.M., her father decided to go to bed and Brown and his wife went upstairs to their bedroom and watched television there.

After a short time, the Browns heard a commotion in the yard among their dogs and then a thump was heard on the sliding doors between the patio and the den. Brown, dressed in his trousers and without shirt or shoes, went downstairs to see what was going on and his wife followed. She stopped at the bottom of the stairs and Brown went into the den, turned on the light and opened the door to the patio. Mrs. Brown saw some men outside, one of whom she recognized as Junior Newman. After the dogs had been quieted, the men came inside the house. Mrs. Brown heard conversation between her husband and the visitors. "They were just talking and kind of joking a little bit or something, I couldn't really tell much of what was said. * * * I heard one of them say, 'You're going to take the oil,' * * * and then a little bit later, * * *, Ray said something about giving them one or two hundred dollars to help them out and when they needed oil, they could apply it against it and then I heard the shots." She heard three shots, punctuated by screams. Two of the shots were fired at a close interval and the third a bit later. The men had been at the house some 10 to 15 minutes when the shots were fired.

Mrs. Brown went upstairs and looking outside saw two men enter an auto and leave. She then went back downstairs and found her husband "laying on his stomach with his face and shoulders scrunched up against the glass of the window, beside the sliding glass door." She called the Jasper County Sheriff's Department.

Officers arrived at the Brown house around 11:00 P.M. They found Brown lying in a pool of blood, dead. He had received three gunshot wounds. One was from a bullet which entered the left cheek and exited in the back of the neck. The second had entered at the base of the neck at the left side and exited at the right shoulder. The physician who conducted an autopsy was of the opinion that neither of those wounds would have been fatal and that the death was caused by a bullet which entered the back of the head and exited at the left eyebrow.

Three spent .45 caliber shell casings were found in the room along with three spent

bullets. One of the bullets was found in a wall, some two feet above the floor in the vicinity of the sliding doors where Brown's body was found.

The officers searched Brown's clothing and discovered a small amount of change, some car keys and a billfold containing a $20 bill.

Officers were promptly dispatched to the Junior Newman residence. After keeping the house under surveillance for 20 to 25 minutes, they went to the house and were admitted by Junior's wife. Junior and his brother, the appellant Jack Newman, were in a bedroom. The officers told Junior that he was wanted for a homicide investigation. Appellant started to walk out of the room and one officer saw a .38 caliber revolver in his inside jacket pocket. Another officer made a pat down search of appellant and a .45 caliber pistol fell to the floor. According to the officers, appellant was cooperative and told them that he had engaged in a "shoot out."

The Newmans were taken to the Joplin City Jail. There Jack's personal property was inventoried. His clothing contained $1,790.67 in cash in three different pockets and a $200 check. At the trial, Van Hooser identified it as the check he had given Brown.

According to the officers, in the early morning hours of October 17, Jack gave them a statement which an officer reduced to writing, but Jack refused to sign it.

According to the statement, Jack had called Brown the previous afternoon about $1300 Brown owed him for oil. At around dark, Brown called Jack and told him to come out and he would pay him. Jack went to Brown's alone and saw Brown at the patio doors. Brown asked him to come in and Jack walked in in front of Brown. Jack turned around and saw Brown grab a .38 caliber pistol out of a money sack and point it between Jack's eyes. Jack took a .45 automatic from his belt and shot two or three times at Brown's face area as fast as he could. He also grabbed the gun from Brown's hands. Jack left through the door he entered. When he left, Brown was on his feet but staggering. Jack drove back to the Newman residence and remained there until the police arrived. He took no money from Brown.

A short time later, Junior made a statement which the police reduced to writing and Junior signed. According to it, Brown owed the oil company where Junior worked some $1300 and the company had been "getting on" Junior. After he and Jack had been drinking, they went to Brown's and discussed the debt briefly. Brown suddenly pulled a gun and pointed it in Junior's face and said he was going to blow his head off. When Brown cocked the gun, Jack drew a gun and fired. Junior fled to the car and Jack followed shortly. He later saw that Jack had Brown's gun.

At his trial, appellant and Junior testified to a somewhat different version of the occurrence. According to appellant, he had become acquainted with Brown as a customer of his brother's oil hauling business, appellant having hauled oil to Brown. He had given Brown $1300 for an automobile several weeks before the shooting, but Brown had not delivered the vehicle. According to appellant, he had made a trip to Colorado and Texas for Brown, accompanied by an employee of Brown named Graham. He had returned to Joplin on Saturday. Brown had asked him to call when he got back (appellant thought it was about the car) and appellant asked his brother to call Brown. At around 9:00 P.M. on Monday appellant returned to Junior's and asked whether Brown had called. Junior called Brown and Brown asked them to come out. When they left Junior's, a dog jumped in the car with them. Junior went along to show appellant where Brown lived. They first drove into a neighbor's driveway and she told them Brown lived next door. When they got to Brown's, Junior got out and went into the house. Appellant started to go in, but the dog which had accompanied them got into a fight with Brown's dogs. The fighting dogs pinned appellant against his car so he got a .45 pistol he had in the car to protect himself from the dogs. With Brown's help the dogs were quieted and appellant went into the house.

"I went into the house, I walked around, my brother walked on the far side * * * [of] the card table. I heard [Mr. Brown] holler: 'I'll blow your blankety–blank head off' * * * I looked and I seen Mr. Brown pulling up * * * that little pistol right there and heading directly towards my brother's face. I hollered, 'No, don't' at Mr. Brown. Mr. Brown come at me directly with it and about the time he got to my face with it, I fired * * * two real fast times. * * * [M]y brother was heading for the rear door which is 180 degrees from where I was standing. Mr. Brown tried to fire on him one more time. I fired one more time * * * I grabbed this gun here and I left the house. * * * Mr. Brown was in a slumped position [I took the .38 caliber revolver from Mr. Brown's house because] I was afraid of getting shot." He took nothing from the Brown residence except the .38 caliber revolver.

Junior's version was similar. He said that he went to Brown's only to show Jack where Brown lived; that he went in the house and Jack stayed outside at first to take care of the dogs; that he was in the house three to five minutes before Jack entered; that he and Brown were "joking" about the dogs; that there was no specific mention of oil; that after Jack came in, " * * * Ray started talking about something about oil, * * *. I could tell by his voice he was getting up a little bit about it, and then he come on and said that something that he didn't want no oil and he wouldn't give–seemed like he said $200.00 for a load of oil, and he said he wasn't running the business, that it was Scott's business from now on, do any business with him or he wasn't taking care of his business–I don't know how he put it for sure. About that time, he pulled that gun and stuck it right up in my face and said, 'I'm going to just blow your head off.' * * * From that point on, I can remember him moving the gun about just a little way from me and then from then on, I was trying to get to the door. * * * I heard shooting then. * * * I wasn't for sure who was shooting or who was getting hit, and I was trying to get to the door, and I heard three shots."

Jack's explanation for the money he had at the time of his arrest was that he had borrowed $1500 from Robert Campbell to replace a motor in a truck and that was the money he had. Campbell testified that he had given Jack $1500 in cash. Campbell also corroborated Jack's testimony that he received the $200 check from Graham. Jack said he had purchased barbecue supplies for Graham in that amount and that at around 9:00 P.M. on October 16, he, in the company of Campbell, had met Graham on the street in Joplin and Graham gave him the check in payment for the barbecue supplies.

A friend of Jack's testified that she saw him in a bar at around 8:30 or 9:00 P.M. on October 16 and Jack had a large amount of money, including some $100 bills. Jack's sister testified that Jack and she were at their mother's along with other members of the family on the afternoon of October 16 and Jack had a large sum of money, including several $100 bills. There was similar testimony from a 14–year–old nephew who was at the family gathering.

Brown's neighbor corroborated the testimony that Jack and Junior drove into her driveway on the night of October 16 and inquired where Brown lived.

Jack and Junior as well as other witnesses testified that Brown had a reputation in the community as a person of violent and turbulent behavior.

The case was submitted to the jury under instruction permitting a finding of guilty of capital murder, first degree murder, second degree murder and manslaughter. The defense of justifiable homicide was submitted except for murder in the first degree. The jury found defendant guilty of murder in the first degree.

In this Court appellant's first contention is that the trial court erred in submitting to the jury the offense of murder in the first degree because there was no evidence from which the jury could find beyond a reasonable doubt that the homicide in this case was within the res gestae of a robbery and emanated from a robbery.

Basically appellant's contention is that the circumstances of the Newmans' visit to Brown's residence—in response to an invitation and without effort to conceal their presence—are so inconsistent with an intent to rob that the most that can be deduced from the evidence was that the taking of the victim's money was merely an afterthought of the homicide rather than the motive for it. This argument ignores the fact that appellant entered the Brown house carrying a .45 caliber pistol and is premised to a considerable extent upon a favorable view of the defendant's evidence.

■ Consideration of this contention requires a review of the evidence in the light most favorable to the verdict, disregarding contrary evidence, and giving the state the benefit of all favorable inferences that can be drawn from the evidence. Although in a circumstantial case, the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt and inconsistent with his innocence and exclude every hypothesis of innocence, "the circumstances need not be absolutely conclusive of guilt or demonstrate impossibility of innocence. '[T]he mere existence of other possible hypothesis is not enough to remove the case from the jury.' *State v. Thomas*, 452 S.W.2d 160, 162 (Mo.1970)." *State v. Morgan*, 592 S.W.2d 796, 805[6][7] (Mo. banc 1980).

■ Here the jury could find that appellant entered the victim's home carrying a deadly weapon, that prior to the use of the weapon money was discussed, that money was taken from the victim and that the victim was shot and killed. In these circumstances the jury could conclude beyond a reasonable doubt that the killing was in furtherance of the robbery and thus within the res gestae of that offense. The jury was at liberty to reject as unreasonable an explanation that robbery was an afterthought to a justifiable homicide. The jury might well consider that such behavior would be so destructive of a defense to the homicide as to be wholly illogical.

Appellant contends that Instruction No. 6 ignored his defense of justifiable homicide

which, he contends, was available to him in the event that the jury found that the only property taken from Brown was the .38 caliber revolver. The instruction required the jury to find that defendant shot Brown in robbing or attempting to rob him. The instruction defined "robbery" as including the elements of the *unlawful* taking of property of another with intent to steal.

■ Notes on Use to MAI–CR (2d) 2.04 require a cross reference in a verdict–directing instruction to any "special negative defense." Self–defense is one of the named "special negative defenses" and pattern instructions for capital murder (MAI–CR 2d 15.02), second degree murder (MAI–CR 2d 15.14) and manslaughter (MAI–CR 15.18) provide for that defense in such cases. However, MAI–CR 15.04–15.12, for use in first degree murder and 15.16 for second degree felony murder made no provision for such defense for the reason that self–defense is not a defense to homicide committed in the perpetration of arson, rape, burglary, robbery or other felony. *State v. Burnett*, 365 Mo. 1060, 293 S.W.2d 335, 343[15–17] (banc 1956).

■ In this case, the claim of appellant based upon his testimony that he took only the revolver for self protection amounts to a denial of any intent to unlawfully take the victim's property with intent to steal, the denial of a robbery. See *State v. Campbell*, 214 N.W.2d 195 (Iowa 1974). If no robbery occurred, appellant, under this instruction, could not be found guilty of murder in the first degree. His evidence was no more than a denial or converse of one of the elements required to be proved by the state. It did not require a reference in the first degree murder instruction to the self–defense instruction.

■ Appellant also attacks Instruction No. 6 on the grounds that it failed to advise the jury that, if the intent to steal was formed after the violence to the person of the victim, the defendant could not be found guilty of murder in the perpetration of a robbery. Appellant contends that such an instruction was required as a part of the

law of the case because the evidence would have permitted the jury to find that, after the defendant shot Brown in lawful self-defense, he then decided to take the money and check from Brown.

Instruction No. 6 followed MAI–CR (2d) 15.12. The language of the instruction, that the defendant caused the death of the victim "in robbing" him, requires the jury to find that the homicide occurred "during the course of" the robbery. See Webster's Third New International Dictionary, "in", lb(2) and (4); 2(a) 2. The instruction permitted and defense counsel employed argument to the effect that the intention to rob must have been formulated at the time of the shooting. The instruction given adequately advised the jury of the law which governed their deliberation.

■ Appellant assigns as error the refusal of the trial court, upon motion of the defendant, to disqualify the prosecutor because the prosecutor's personal and business relationship with the victim gave the prosecutor such a personal interest in the outcome of the case that it precluded his affording the defendant fair treatment.

The defendant's motion to this effect was filed on the morning the trial was set to begin. The prosecutor acknowledged that he had served as a pallbearer at Brown's funeral; that he and the law firm of which he was a member had represented Brown personally and in his business activity since 1970; that at the time of the trial he was representing Mrs. Brown in an estate matter; that he had visited in the Brown home socially and hunted with Brown; that he had gone to the Brown home on the night of the shooting and also to the jail but that he did not participate further in the investigation in the case. The prosecutor stated that he had no interest in the outcome of the litigation above any other criminal case he might try.

The motion was overruled and the case proceeded to trial. The burden of the trial for the state was carried by an assistant prosecuting attorney. He made the opening statement, conducted the direct examination of most of the state's witnesses, cross–examined most of the defense witnesses and made the opening argument for the state at the conclusion of the case. The prosecutor conducted direct examination of some state's witnesses and cross–examined the defendant and two other defense witnesses. He made the rebuttal on closing argument.

After the case had gone to the jury, the prosecutor requested the court to make a finding as to whether or not he had afforded the defendant a fair trial. Defense counsel stated that, in his opinion, the prosecutor had not done so, complaining of the "rather emotional" closing argument in a "quivering" voice. He also complained of lack of cooperation on the part of the prosecutor and his assistant, particularly of their failure to inform him in advance that one of the state's witnesses would demonstrate the operation of the firearms involved in the case.

The court stated that he did not consider the prosecutor's closing argument "as emotional" as defense counsel indicated. He stated that he saw nothing during the course of the trial which indicated other than that the defendant received a fair trial.

In this court, appellant contends that the relationship between Brown and the prosecutor gave the prosecutor a personal interest in the outcome of the trial and required that the prosecutor be disqualified to participate in the trial.

■ A motion such as that filed by the defendant is necessarily directed to the trial court's discretion. Here the trial court considered the motion and the accompanying affidavit sufficient to call for an inquiry into the matter. State v. Harris, 477 S.W.2d 42, 44–45[1, 2] (Mo.1972). The court concluded that the prosecutor had no such interest in the case as required that he be disqualified. The finding of the court was not an abuse of discretion.

Although defense counsel complained, at the conclusion of the trial, of unfair treatment on the part of the prosecutor, he was hard put to produce any action on the part

of the prosecutor which was unfair or reflected excessive personal concern in the outcome of the case. The trial judge found that the prosecutor had conducted his role in the trial in a fair manner. In these circumstances, there is no basis for a contrary conclusion in this court. Certainly, the prosecutor's conduct in this case was in no manner comparable to that in cases where it has been found that the prosecutor should have been disqualified. See *State v. Jones*, 306 Mo. 437, 268 S.W. 83 (1924), and *State v. Nicholson*, 7 S.W.2d 375 (Mo.App. 1928).

Appellant's final claim of error is based upon the trial court's failure to grant a mistrial when the assistant prosecutor, in examining a police officer who participated in the arrest of the Newmans, inquired whether, upon receipt of a dispatch to the effect that Newman was wanted, he got a "mug shot" of Junior Newman. Defense counsel objected that the question was intended to create the impression that Junior Newman was a police character and that its prejudicial effect required that a mistrial be granted. The trial court pointed out that a similar question had been asked another police officer and answered negatively, without objection. The trial court offered to instruct the jury to disregard the question, but denied the request for a mistrial. Defense counsel declined the offer of instruction to disregard the question.

██ Enough has been written about the term "mug shot" to demonstrate that it should not be employed in a criminal trial. See *State v. Rutledge*, 524 S.W.2d 449, 458[11, 12] (Mo.App.1975); *State v. Harris*, 534 S.W.2d 516, 518–521 (Mo.App.1976); *State v. Lorenze*, 592 S.W.2d 523, 529[13, 14] (Mo.App.1979). Enough also has been written of the nature of appellate review of trial court rulings on request for a mistrial to make repetition here unnecessary. It is sufficient to say that the trial court's ruling has not been demonstrated to have been an abuse of discretion. The question related to a witness, not to the defendant. The courts have not ascribed to the term objected to the same connotation as defendant's counsel

raised. *Harris.* The trial court's assessment of the prejudicial effect of the inquiry will not be disturbed.

Affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.

ON MOTION FOR REHEARING

PER CURIAM:

██ Appellant's motion for rehearing points out the court's opinion overlooked his complaint that Instruction No. 6 hypothesized a killing "* * * in robbing or attempting to rob * * *" and that since the evidence showed either a completed robbery or no robbery at all, there was no evidence to support a submission based upon a killing in attempting to rob.

A similar objection was considered and rejected in *State v. Bradley*, 361 Mo. 267, 234 S.W.2d 556, 562[18, 19] (1950). In that case, in rejecting the contention that the evidence showed only a completed robbery and not an attempt which failed, the court noted that the charge was murder, not robbery, and stated: "* * * [I]t is immaterial (on the issue of defendant's guilt or innocence of murder) whether the shown homicide was committed in 'an attempt' to rob or in 'robbery.'" 234 S.W. 2d 562. As pointed out in *Bradley*, cases (such as *State v. Baker*, 276 S.W.2d 131 (Mo.1955), relied upon by appellant) which hold that where the evidence shows that a crime was consummated, the defendant cannot be convicted of an attempt to commit the crime are inapposite insofar as submission of the underlying felony in felony murder is concerned.

The instruction given followed the language of MAI–CR 15.12. Its use in this case was not error.

Motion for rehearing overruled.