STATE of Missouri, Respondent,

v.

Patrick STARR, Appellant.

No. WD 54504.

Missouri Court of Appeals,
Western District.

June 8, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 27, 1999.

Application for Transfer Denied
Sept. 21, 1999.

Kent Denzel, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Stephen D. Hawke, Assistant Attorney General, Jefferson City, for Respondent.

Before HOWARD, P.J.,
BRECKENRIDGE and SPINDEN, JJ.

BRECKENRIDGE, Chief Judge.

Patrick Starr appeals from his convictions of attempted first degree robbery,

§ 569.020, § 564.011, RSMo 1994;[1] second degree felony murder, § 565.021(2); and two counts of armed criminal action, § 571.015. The trial court sentenced Mr. Starr as a prior offender pursuant to § 558.016 and § 557.036.4. Mr. Starr was sentenced to fifteen years imprisonment for attempted robbery, life imprisonment for second degree murder, and life imprisonment for the two counts of armed criminal action. The trial court ordered that the sentences for attempted first degree robbery and the related count of armed criminal action would run concurrently. The sentences for second degree murder and the related armed criminal action count would run concurrently to each other, but consecutive to the sentences for attempted first degree robbery and the armed criminal action related thereto. Mr. Starr raises four points on appeal. First, he contends that the trial court erred by refusing to submit to the jury a self-defense instruction in connection with the second degree felony murder charge because there was sufficient evidence to support submission of the instruction. Second, Mr. Starr alleges that the trial court erred by denying his motion for a continuance following the State's change of a proposed stipulation regarding fingerprint identification because this change interfered with his trial strategy. Mr. Starr also contests the trial court's refusal to admit a forensic animation video because the video would have aided the jury in evaluating his testimony. Finally, Mr. Starr contends that the trial court erred by sentencing him, after retrial, to a greater sentence than he received when previously convicted, which increased sentence was presumptively the result of judicial vindictiveness in retaliation for successfully exercising his right to appeal.

On December 1, 1998, this court issued an opinion addressing Mr. Starr's first, second and fourth points. We were unable to address point three at that time because the record on appeal did not include the forensic animation video. Following our ruling, Mr. Starr filed a motion for rehearing, supplementing the record with the video. We granted Mr. Starr's motion for rehearing to address his third point, regarding the exclusion of the video. We now withdraw our December 1, 1998, opinion and issue this one in its place.

The judgment of the trial court is affirmed.

### Factual and Procedural Background

Mr. Starr does not contest the sufficiency of the evidence, therefore, only a brief statement of the facts is necessary. On appeal, the evidence is considered in the light most favorable to the verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995). On May 19, 1994, Mr. Starr was riding around Kansas City in a van with four other men: Anthony Davis, Roderick Burnett, Charles Shirley, and Reno Hardy. They stopped to purchase fuel at an Amoco station on 49th Street and Swope Parkway. While still at the gas station, Mr. Starr noticed a 1986 Ford Thunderbird with "triple gold roadster" wheels parked beside a pay phone directly across the Amoco parking lot. Mr. Starr had previously stated that he was going to "jack" the Thunderbird for its wheels.

As Mr. Starr sat on the passenger side of the back seat of the van, next to the open sliding cargo door, he told the driver, Mr. Davis, to drive over to the Thunderbird, so he could get the rims from the man with the Thunderbird. Mr. Davis complied, pulling the van parallel to the car. The passenger sides of the vehicles were adjacent and Mr. Starr was seated directly across from Samuel McKay, the passenger in the Thunderbird, when Mr. Starr yelled, "Get out before I kill you." Witness testimony about who shot first was inconclusive. However, the evidence

---

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

showed that Mr. Starr shot Mr. McKay one time with a twelve gauge shotgun, inflicting a fatal wound to the heart. Mr. McKay fired ten shots from a Glock .45 handgun, striking Mr. Starr once in the knee. Mr. McKay died at the scene.

Following the incident, Mr. Starr's companions took him to Menorah Hospital. While being treated for the gunshot wound and later, while being questioned by the police, Mr. Starr made several contradictory statements regarding the circumstances of his injury. Following an investigation, the State charged Mr. Starr with attempted first degree robbery, second degree felony murder and two counts of armed criminal action. Mr. Starr was first tried on February 6 through 9, 1995. At this trial, a jury convicted him of all charges. Before sentencing, the State withdrew one count of armed criminal action. The trial court then sentenced Mr. Starr, as a class X offender, to fifteen years imprisonment for attempted first degree robbery, thirty years imprisonment for second degree felony murder, and five years imprisonment for one count of armed criminal action. The trial court ordered the terms to be served concurrently.

Following a successful motion for post-conviction relief, the motion court reversed Mr. Starr's convictions and remanded the cause for a new trial, which was held on March 31 through April 3, 1997. At the second trial before a new trial judge, a jury convicted Mr. Starr of attempted robbery, second degree felony murder, and two counts of armed criminal action. The trial judge sentenced Mr. Starr to fifteen years imprisonment for attempted robbery, life imprisonment for second degree murder, and life imprisonment for each armed criminal action conviction. The trial court ordered the terms for attempted first degree robbery and the associated armed criminal action to be served concurrently. The terms for second degree felony murder and the related armed criminal action were also to be served concurrently, but consecutive to the terms for attempted first degree robbery and armed criminal action. As a result, Mr. Starr was effectively sentenced to two consecutive life terms. This timely appeal followed.

## Point I—Denial of Self–Defense Instruction

As his first point on appeal, Mr. Starr contends that the trial court erred by refusing to submit a self-defense instruction to the jury when there was sufficient evidence to support such an instruction. Mr. Starr relies upon his evidence that he shot Mr. McKay in self-defense after the driver of the van made a reckless U-turn close to the Thunderbird and Mr. McKay began shooting at the van. The State argues that, regardless of the evidence, self-defense is not available as a defense to felony murder. Relying on *State v. Newman,* 605 S.W.2d 781, 786 (Mo.1980), the trial court refused to submit the self-defense instruction offered by Mr. Starr.

In *Newman,* like here, the verdict director for felony murder did not submit the defendant's defense of justifiable homicide. In ruling that self-defense did not need to be submitted, the Supreme Court stated:

> Notes on Use to MAI–CR (2d) 2.04 require a cross reference in a verdict-directing instruction to any "special negative defense." Self-defense is one of the named "special negative defenses" and pattern instructions for capital murder (MAI–CR 2d 15.02), second degree murder (MAI–CR 2d 15.14) and manslaughter (MAI–CR 15.18) provide for that defense in such cases. However, MAI–CR 15.04–15.12, for use in first degree murder and 15.16 for second degree felony murder made no provision for such defense for the reason that self-defense is not a defense to a homicide committed in the perpetration of arson, rape, burglary, robbery or other felony. *State v. Burnett,* 365 Mo. 1060, 293 S.W.2d 335, 343 [15–17] (banc 1956).

*Id.* Mr. Starr claims it was error for the trial court to follow the precedent of *New-*

*man,* because changes in the law subsequent to *Newman* make it no longer controlling.

Mr. Starr is correct that after *Newman* the Supreme Court approved MAI–CR 3d and, under these revised criminal instructions, none of the verdict directors for homicide make reference to self-defense. *See* MAI–CR 3d 313.02—313.12. Self-defense is now a separate instruction and its Notes on Use do not preclude a self-defense instruction being submitted for felony murder. *See* MAI–CR 3d 306.06, Notes on Use. Therefore, the rationale of *Newman,* that self-defense is not available as a defense to felony murder because it was not provided for in MAI–CR 2d, is no longer viable.

In *Newman,* the Supreme Court's holding was also based on *State v. Burnett,* 365 Mo. 1060, 293 S.W.2d 335, which the Supreme Court cited for the general principle that self-defense is not a defense to a homicide committed in the perpetration of a felony. 605 S.W.2d at 786. This rule of law is called into question, however, by a subsequent decision of the Supreme Court. In *State v. O'Neal,* 618 S.W.2d 31, 38 (Mo. 1981), the Supreme Court stated that "[u]nder the terms of the statutory language of § 565.003[, RSMo 1978,] one can be convicted of first degree murder (felony murder) even though he did not intend to kill someone, *unless the death is excusable or justifiable.*" (emphasis added). A killing is justifiable if the perpetrator acted in self-defense. *See* § 563.026. *See also* § 563.031.

So, the language of *O'Neal* is at odds with *Newman.*[2]

▪ Nevertheless, it is unnecessary to decide whether *Newman* or *O'Neal* is the last controlling decision of the Supreme Court. Even assuming the instructional error alleged by Mr. Starr, there must be prejudice to him before the jury's verdict is overturned. *State v. Gilmore,* 797 S.W.2d 802, 805 (Mo.App.1990). While it is strongly presumed "that prejudice exists where there is anything less than 'religious observation both as to the forms ... and instructions contained in [the] Notes on Use' of the Missouri Approved instructions," that presumption may be rebutted. *Id.* Prejudice exists if there is a likelihood that the jury will be misled or confused by the instructions. *Id.* at 806. "Starting with a presumption of prejudice, the reviewing court will consider the facts and the instructions together in deciding if it is 'clearly shown' that no prejudice exists." *Id.* at 805. Under the facts of this case, Mr. Starr clearly suffered no prejudice by the refusal of his self-defense instruction. The evidence Mr. Starr claims mandates the submission of a self-defense instruction was testimony by Mr. Starr and Mr. Burnett that Mr. Starr shot Mr. McKay only after the driver of the van made a reckless U-turn close to the Thunderbird in which Mr. McKay was seated, and Mr. McKay began shooting at the van. Relying on this evidence, Mr. Starr's theory of defense at trial was that no attempted robbery occurred. Contrary to Mr. Starr's scenarios in his brief which might justify self-defense by the perpetrator of a felony, there was no evidence at trial to justify Mr. Starr's shooting of Mr. McKay during an attempted robbery.

The verdict director submitted for second degree felony murder charge against Mr. Starr required the jury to find, beyond a reasonable doubt, that:

---

2. Mr. Starr argues that another Supreme Court decision subsequent to *Newman* mandates the inclusion of a self-defense instruction for felony murder whenever there is testimony supporting self-defense. He relies on the fact that the Court, in *State v. Clark,* 652 S.W.2d 123, 126 (Mo. banc 1983), set out in a footnote the felony murder verdict director which referenced a self-defense instruction. *Id.* at 125 n. 2. The Supreme Court was considering the sufficiency of the evidence to convict for second degree felony murder and whether felony murder is a lesser included offense of capital murder, not the availability of self-defense for felony murder. *Id.* at 125–28. Therefore, *Clark* is not authority for submitting a self-defense instruction in a felony murder case.

First, that Patrick Starr attempted to commit the offense of robbery in the first degree, as submitted in Instruction No. 8, and

Second, that Patrick Starr caused the death of Samuel McKay by shooting him, and

Third, that Samuel McKay was killed as a result of the attempted perpetration of that robbery in the first degree.

\* \* \*

Under this verdict director, the jury was called upon to decide whether Mr. McKay was killed during the commission of an attempted robbery. If the jury had believed Mr. Starr's evidence that he was not attempting to rob Mr. McKay at the time of the shooting, but was only responding to Mr. McKay shooting at the van after it made a reckless U-turn, the jury would have found him not guilty of felony murder. Submission of a self-defense instruction would not have affected the jury's determination either way, because either Mr. Starr was guilty of attempted robbery in the first degree and, therefore, felony murder, or he was guilty of neither. When the inclusion of the self-defense instruction is unnecessary, its omission is clearly not prejudicial. Therefore, the jury verdict should not be disturbed. *See* *Gilmore*, 797 S.W.2d at 805–06. Point I is denied.

### Point II—Denial of Motion for Continuance

■ As his second point on appeal, Mr. Starr contends that the trial court erred by denying his oral motion for a continuance after the State changed a proposed stipulation regarding fingerprint identification, because the change and the subsequent denial of his motion for a continuance interfered with his trial strategy. Although Mr. Starr's explanation of the effect of the change on his trial strategy is difficult to discern, Mr. Starr essentially contends that the change affected his contention that a robbery did not occur.

Under Supreme Court Rule 24.09, a motion for a continuance must "be made by a written motion accompanied by the affidavit of the applicant ... setting forth the facts upon which the application is based, unless the adverse party consents that the application for continuance may be made orally." On the last day of trial, Mr. Starr made an oral motion for a continuance and did not provide a written affidavit supporting his motion. There is nothing in the record on appeal to indicate that the State consented to such an oral application. Mr. Starr's failure to comply with Rule 24.09 is sufficient, by itself, to sustain the trial court's ruling. *State v. Fuller*, 837 S.W.2d 304, 306 (Mo.App.1992).

■ Even if Mr. Starr had complied with the requirements of the rule, the trial court would not have been required to grant the continuance. "The decision to grant or deny a continuance is within the sound discretion of the trial court." *State v. Taylor*, 944 S.W.2d 925, 930 (Mo. banc 1997). Mr. Starr must make a very strong showing of abuse of discretion and demonstrate that he was prejudiced to be entitled to relief. *Id.* at 930.

Mr. Starr contends that the trial court should have granted him a continuance since the State decided not to abide by the proposed stipulation concerning fingerprints on the murder weapon. The original stipulation provided that there were two fingerprints on the murder weapon, one of which was Mr. Burnett's and one of which was Mr. Hardy's. Near the close of Mr. Starr's evidence, the State determined that there was only one fingerprint on the weapon, which had not been identified. Upon learning this information, the State indicated that it was unwilling to abide by the prior stipulation. However, the State agreed to stipulate that there was only one fingerprint on the murder weapon and it was not Mr. Starr's.

■ Mr. Starr essentially argues that the change in the stipulation affected the jury's view of who owned the murder

weapon and that ownership of the weapon furnished the jury an additional basis to infer Mr. Starr's intent to commit robbery. Mr. Starr asserts that evidence of Mr. Burnett's and Mr. Hardy's fingerprints on the shotgun support his defense that the gun was not his and that he just grabbed it in response to shots being fired by Mr. McKay. The changed stipulation, which advised the jury that there was an unidentified fingerprint on the weapon which was not Mr. Starr's, is not materially different from the stipulation that the two fingerprints on the weapon were from Mr. Burnett and Mr. Hardy. In fact, the changed stipulation expressly explained to the jury that Mr. Starr's fingerprint was not found on the weapon, which is more exculpatory than the proposed stipulation, which left the jury to deduce that Mr. Starr's fingerprint was not found on the murder weapon. Furthermore, Mr. Starr has never suggested how he would have changed his trial strategy in response to the change of the stipulation, considering that Mr. Starr never contended that he was not the shooter and he admitted that he shot Mr. McKay.

The change in the stipulation was insignificant to Mr. Starr's defense. As a result, Mr. Starr does not demonstrate the required prejudice, so he has not satisfied his burden of showing that the trial court abused its discretion. The trial court did not err in denying Mr. Starr's oral motion for a continuance. Point II is denied.

### Point III—Exclusion of Evidence

■ As his third point on appeal, Mr. Starr contends that the trial court erred by refusing to admit into evidence a "forensic animation" video because the video would have aided the jury in evaluating his testimony. Mr. Starr asserts that the video recreated "from three different angles the approach of the van to [Mr.] McKay's car, and the sequence of gunshots as testified to by [Mr. Starr], which he testified fairly and accurately illustrated his testimony to help the jury understand what happened." The State responds that the trial court did not abuse its discretion in refusing this evidence because Mr. Starr's testimony was not complicated and other demonstrative evidence, which was available and already admitted, could have been used to aid the jury's understanding of Mr. Starr's version of the shooting. This court finds that the trial court did not abuse its discretion by refusing to admit the forensic animation video as demonstrative evidence.

■ When a criminal defendant claims the trial court erred in excluding relevant evidence, the error, if shown, is presumed prejudicial. *State v. Bowens*, 964 S.W.2d 232, 237 (Mo.App.1998). The presumption of error can be overcome only if the error was harmless beyond a reasonable doubt. *Id.* However, the evidence must be logically and legally relevant for the presumption of prejudice to arise. See id. For evidence to be logically relevant, it must tend to prove a disputed fact, corroborate other relevant evidence or relate to an issue central to the case. *Id.* Evidence is legally irrelevant when it is logically relevant, but injects prejudice and confusion into the proceeding which outweigh its probative value. *Id.* at 238. Because the trial court is in a unique position to gauge the probative value and the prejudicial effect of offered evidence, it is afforded broad discretion in admitting or rejecting evidence, including demonstrative evidence. *State v. Candela*, 929 S.W.2d 852, 867 (Mo.App.1996). The trial court's ruling on the exclusion of demonstrative evidence proffered by the defendant will not be disturbed absent a showing of a clear abuse of discretion. *Bowens*, 964 S.W.2d at 237.

In most cases addressing the admissibility of videotape evidence, the defendant argues that the demonstrative evidence should *not* have been received. In this case the opposite is true, but the analysis remains the same. Here, the trial court viewed the forensic animation video and determined that there was nothing in the

video that would aid the jury in determining Mr. Starr's guilt or innocence. The court also considered that the video could improperly bolster Mr. Starr's testimony. Finally, the court stated concerns about showing the jury a television depiction of Mr. Starr's version of the shooting. From the trial court's ruling, it is clear that the court carefully considered and weighed the probative value of the video against its prejudicial effect on the State's case. As previously stated, it is for the trial court to determine the legal relevance of evidence and this court gives deference to that ruling unless a clear abuse of discretion is shown. *Id.* at 237–38.

■ Having viewed the video, this court finds that the trial court did not abuse its discretion in ruling that the forensic animation video was inadmissible. The trial court's concerns about the effect of the jury watching a re-creation of the defendant's version of the crime were justified.

A motion picture of the artificial re-creation of an event may unduly accentuate certain phases of the happening, and because of the forceful impression made upon the minds of the jurors by this kind of evidence, it should be received with caution. As pointed out by Wigmore, such a portrayal of an event is apt to cause a person to forget that "it is merely what certain witnesses say was the thing that happened" and may "impress the jury with the convincing impartiality of Nature herself." (3 Wigmore, Evidence [3rd ed.], § 798a, p. 203).

*State v. Anderson,* 862 S.W.2d 425, 431(Mo.App.1993) (quoting *People v. Dabb,* 32 Cal.2d 491, 197 P.2d 1, 5 (1948)). While Anderson involved a re-creation by live actors, its reasoning is applicable to this case. It is not the human element which concerns the court. It is the impact on the jury of watching the disputed event transpire on the television screen, before their eyes, in the manner described by the defendant which causes this court to agree

that video re-creations, even animations, "should be received with caution." *Id.*

Because the trial court determined that the video's prejudicial effect outweighed its probative value, the tape was not legally relevant and the presumption of prejudice from its exclusion never arose. See Bowens, 964 S.W.2d at 237–38. Mr. Starr failed to demonstrate that the trial court abused its discretion in excluding the forensic animation video, so its ruling excluding the videotape is affirmed. See Anderson, 862 S.W.2d at 431–32. Point III is denied.

### Point IV—Increased Sentence After New Trial

■ As his fourth point on appeal, Mr. Starr contends that the trial court erred by ordering him to serve a sentence in his second trial which was greater than the sentence he received in his first trial, because the increased sentence was presumptively the result of vindictiveness or retaliation against him for successfully exercising his right to appeal his original conviction. Mr. Starr's argument stems from the increase of his original thirty-year sentence to two consecutive life sentences following retrial, which he claims was without an objective reason for the increase.

■ Under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, a sentencing judge may not increase a defendant's sentence where that increase is motivated by the vindictiveness of the sentencing judge. *North Carolina v. Pearce,* 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969). In *Pearce,* the Supreme Court, in a consolidated appeal, affirmed the grant of habeas corpus petitions from two defendants who received more severe sentences after they successfully sought new trials from their criminal convictions. In both cases, the defendants claimed that the sentencing judges punished them for success-

fully appealing their original convictions by increasing their sentences on retrial.

The *Pearce* court relied on the Due Process Clause to find error on the part of the sentencing judges. "Due process of law ... requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id.* The *Pearce* court was primarily concerned with chilling defendants' exercise of their rights to appeal for fear of being punished for that action by the sentencing judge in a subsequent trial. *Id.* Therefore, the *Pearce* court determined that:

> [W]henever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

*Id.* at 726, 89 S.Ct. at 2081. This rule has become known as the *Pearce* presumption.

The *Pearce* presumption has been limited by subsequent Supreme Court cases. In *Alabama v. Smith,* 490 U.S. 794, 799, 109 S.Ct. 2201, 2204, 104 L.Ed.2d 865 (1989) (quoting *Texas v. McCullough,* 475 U.S. 134, 138, 106 S.Ct. 976, 979, 89 L.Ed.2d 104 (1986)), the United States Supreme Court held that the *Pearce* presumption of vindictiveness "do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial." The Court stated that " 'the evil the [*Pearce* ] Court sought to prevent' was not the imposition of 'enlarged sentences after a new trial,' but 'vindictiveness of a sentencing judge.' " *Id.* (quoting *McCullough,* 475 U.S. at 138, 106 S.Ct. at 979). The *Smith* Court explained, "Because the *Pearce* presump-

tion may operate in the absence of any proof of an improper motive and thus ... block a legitimate response to criminal conduct, we have limited its application ... to circumstances where its objectives are thought most efficaciously served." *Id.* 109 S.Ct. at 2205 (internal quotations and citations omitted). The Court explained that circumstances where the presumption's objectives are most efficaciously served are those "in which there is a reasonable likelihood that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Id.,* 109 S.Ct. at 2205 (internal quotations and citations omitted). "Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness." *Id.* at 799–800, 109 S.Ct. at 2205.

The *Smith* Court cited *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) as an example of a situation in which the *Pearce* presumption does not apply. *Smith,* 490 U.S. at 800, 109 S.Ct. at 2205. In *Colten,* the defendant's sentence was increased by the second court in a two-tiered system which allowed a misdemeanor defendant convicted in an inferior court to obtain a trial *de novo* in the superior court. *Colten,* 407 U.S. at 105–06, 92 S.Ct at 1955. The Court observed that the trial *de novo* represented a "completely fresh determination of guilt or innocence" by a court that was not being "asked to do over what it thought it had already done correctly." *Id.* at 117, 92 S.Ct at 1960. The Court found that greater penalties upon a trial *de novo* were not so frequently the result of vindictiveness as to warrant a prophylactic rule. *Id.* at 116, 92 S.Ct at 1960. The *Smith* Court also cited *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) for the proposition that when a second jury, on retrial after a successful appeal, imposes a harsher penalty than the original jury, no presumption of vindictiveness arises. *Smith,* 490 U.S.

at 800, 109 S.Ct. at 2205. The *Chaffin* Court found that a second jury was unlikely to have a "personal stake" in the prior conviction or to be "sensitive to the institutional interests that might occasion higher sentences." 412 U.S. at 27–28, 93 S.Ct. at 1983.

The *Smith* Court also relied heavily upon *McCullough.* 490 U.S. at 798–99, 109 S.Ct. at 2204–05. In *McCullough,* the defendant appealed from his increased sentence after retrial. 475 U.S. at 135, 106 S.Ct. at 977. At the original trial the jury fixed punishment, while the trial judge assessed the punishment at the second trial. *Id.* at 136, 106 S.Ct. at 977. The *McCullough* court refused to apply the *Pearce* presumption when the trial court had granted the defendant's motion for a new trial because " 'unlike the judge who has been reversed', the trial judge here 'had no motivation to engage in self-vindication.' " *Id.* at 139, 106 S.Ct. at 979 (quoting *Chaffin,* 412 U.S. at 27, 93 S.Ct. at 1983). *McCullough* further held that where there are two different sentencers, a sentence increase cannot truly be said to have taken place. *Id.* at 140, 106 S.Ct. at 979. Quoting *Colten,* the Court noted, "[I]t may often be that the [second sentencer] will impose a punishment more severe than that received from the [first]. But it no more follows that such a sentence is a vindictive penalty for seeking a[new] trial than that the [first sentencer] imposed a lenient penalty." *Id.,* 106 S.Ct. at 979–80 (quoting *Colten,* 407 U.S. at 117, 92 S.Ct at 1960–61). The court determined that "in each case, we look to the need, under the circumstances, to 'guard against vindictiveness in the resentencing process.' " *Id.* at 138, 106 S.Ct. at 979 (quoting *Chaffin,* 412 U.S. at 25, 93 S.Ct. at 1982). Under the circumstances of the case, the Supreme Court found no error in the sentence. *Id.* at 140, 106 S.Ct. at 980.

Mr. Starr argues that the *Pearce* presumption of vindictiveness should apply in situations, such as his, where a second, different sentencing judge imposes a harsher sentence than the first without stating an objective reason for that sentence. In this argument, Mr. Starr ignores the precedent of the subsequent United States Supreme Court cases which refine the *Pearce* rule. In declining to apply the *Pearce* presumption to the instant case, we find *McCullough* particularly persuasive. In *McCullough,* the defendant was first sentenced by a jury and after retrial, by a judge. The court found the *Pearce* presumption did not apply because "different sentencers assessed the varying sentences." *McCullough,* 475 U.S. at 140, 106 S.Ct. at 979. In this case, a different judge sentenced Mr. Starr after his retrial. Like when a judge sentences a defendant to a harsher sentence after retrial than did a previous jury, when a second, different judge imposes a harsher sentence, we do not see the necessity in applying a prophylactic rule because there is little reason for the second judge to be vindictive since he or she did not preside at the first trial. "The presumption of *Pearce* does not apply in situations where the possibility of vindictiveness is this speculative, particularly since the presumption may often 'operate in the absence of any proof of an improper motive and thus . . . block a legitimate response to criminal conduct.' " *Id.* at 139, 106 S.Ct. at 980. (quoting *United States v. Goodwin,* 457 U.S. 368, 373, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982)).

Although we decline to apply a presumption of vindictiveness in the present case, "the defendant may still obtain relief if he can show actual vindictiveness upon resentencing." *Id.* at 138, 106 S.Ct. at 979. Mr. Starr, however, makes no effort to show affirmative evidence of vindictiveness by the second trial judge. He simply argues that there is a presumption of vindictiveness without presenting any evidence of such. Absent a presumption of vindictiveness, the defendant cannot carry the issue by simply pointing to the second sentencer's lack of explanation for imposing a more severe sentence. Point IV is denied.

The judgment of the trial court is affirmed.

All concur.