STATE of Missouri, Respondent,

v.

Robert DRISCOLL, Appellant.

No. SC 82402.

Supreme Court of Missouri,
En Banc.

Sept. 11, 2001.

Deborah B. Wafer, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, John M. Morris, Assistant Attorney General, Jefferson City, for respondent.

LIMBAUGH, Chief Justice.

On July 3, 1983, corrections officer Thomas Jackson was stabbed to death during a riot at the Missouri Training Center for Men in Moberly. Appellant, Robert Driscoll, an inmate, was charged with capital murder, convicted by a jury and sentenced to death in accordance with the jury's recommendation. This Court affirmed, *State v. Driscoll*, 711 S.W.2d 512 (Mo. banc 1986), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986), but the United States Court of Appeals for the Eighth Circuit granted habeas corpus relief. *Driscoll v. Delo*, 71 F.3d 701 (8th Cir.1995), *cert. denied*, 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996). On retrial in 1999, a jury again convicted Driscoll of capital murder and recommended the death penalty, which the trial court again imposed. This Court has exclusive jurisdiction of the appeal. Mo. Const. art. V, sec. 3. The judgment of conviction and sentence is reversed, and the case is remanded.[1]

## FACTS

The facts, which are viewed in the light most favorable to the verdict to determine

---

[1.] Inmates Rodney Carr and Roy "Hog" Roberts were also charged and convicted for the murder. Rodney Carr was sentenced to life imprisonment. *State v. Carr,* 708 S.W.2d 313 (Mo.App.1986). Roy "Hog" Roberts was sentenced to death and has since been executed. *State v. Roberts,* 709 S.W.2d 857 (Mo. banc 1986).

the sufficiency of the evidence, *State v. Black*, 50 S.W.3d 778, 788 (Mo. banc 2001), are as follows:

On the evening of July 3, 1983, Driscoll and his cellmate, James Jenkins, were serving and drinking homemade wine in their cell in the B wing of Housing Unit 2 at the Moberly Training Center. When guards noted this activity, Officer Jackson ordered Jenkins to leave the cell, but Jenkins refused, and Jackson called additional officers to help remove him. Anticipating a search, the inmates in B wing threw knives and other items of contraband out of their cells. However, Driscoll, who had assembled a knife he made from a metal ruler and other materials he acquired while working in the prison's sign shop, stuck the knife in his waistband and walked into the hallway with other inmates.

Officer Jackson then returned with two other officers. They removed Jenkins from his cell and began to escort him through B wing toward the security control center in the rotunda area. Inmate Roy "Hog" Roberts told the others that "[if they] let the correctional officers take Jimmie Jenkins out of there, they were a bunch of sorry inmates." As the officers walked Jenkins through B wing, inmates shouted, "You're not taking Jimmie anywhere," and finally, "Let's rush them." Before Officer Jackson could follow the other officers and Jenkins into the rotunda, a group of approximately 25 to 30 inmates, including Driscoll, charged toward him. During the ensuing melee, Roberts, who weighed more than 300 pounds, grabbed Officer Jackson and held him from behind while Driscoll and then inmate Rodney Carr stabbed him. Numerous inmates fought with other correctional officers, and three officers besides Jackson were stabbed. After Driscoll stabbed Jackson, he dropped the knife,

which Officer Robert Wilson recovered and kept in his belt. Eventually, Officer Jackson was taken to the infirmary, where he was pronounced dead. He had stab wounds in both his chest and abdomen, but the wounds to his chest penetrated his heart and lungs and caused his death.

Once the correctional officers restored order, Driscoll and other inmates returned to B wing. Driscoll went to his cell and changed his clothes. According to inmate Joseph Vogelpohl, who had taken refuge in the cell, Driscoll said, "Did I take him out, Jo Jo, or did I take him out?" Driscoll also told his cellmate Jenkins that he had "killed the freak."

The next day a Department of Corrections officer and a highway patrol officer interviewed Driscoll. He was advised of and waived his *Miranda* rights, then gave and signed a confession that the officers reduced to writing. After giving a detailed description of the riot, Driscoll added:

> When the fighting started I got hit, and I pulled the knife out and started stabbing at the officer in front of me. At this time I did not know who the officer was. I don't know how many times I stabbed him, or if I stabbed him more than once.

## ARYAN BROTHERHOOD EVIDENCE

The primary focus of the appeal in both guilt phase and penalty phase is the introduction of evidence of Driscoll's membership in a hate group known as the Aryan Brotherhood. This evidence was first introduced via the transcript of inmate Jenkins' testimony from the first trial that was read to the jury during the guilt phase. On redirect examination, Jenkins testified: (1) that Driscoll was a member of the Aryan Brotherhood—a "white organization of white men to help other white boys—men—young men. It's a prison

gang is what it is. They kill and murder all the time—it's a way of life," (2) that Driscoll's tattoo—a six-shooter with some words around it and the initials AB— marked him as an Aryan Brotherhood member, and (3) that he [Jenkins] was not an Aryan Brotherhood member because Driscoll told him that you have to kill a black man to join. In addition, Mark Schreiber, one of the officers who interviewed Driscoll after the murder, testified by identifying and describing a photograph of Driscoll taken the day after the riot that showed an Aryan Brotherhood tattoo on Driscoll's chest. As Schreiber explained, the tattoo depicted a revolver and clenched fist, with the words "Wis Mach," which is German for "white power," and the initials "AB," which stands for Aryan Brotherhood.

The prosecutor's use of this evidence was minimal. In the guilt phase closing argument, the prosecutor made no reference to the evidence at all. During argument in the punishment phase of the trial, the prosecutor described Driscoll's Aryan Brotherhood tattoo and suggested that Driscoll had killed Officer Jackson "for apparently no better reason than to enhance his stature within the prison system, and in part because of his membership in the Aryan Brotherhood."

The basis of Driscoll's numerous objections at trial and his related point on appeal is that the evidence and argument were irrelevant to the murder of Officer Jackson (who was white), that the jury was permitted to infer that Driscoll had a propensity for murder and violence, and that Driscoll was "convicted of guilt by association." In addition, Driscoll maintains that the trial court erred by refusing to allow Driscoll to waive cross-examination of state's witness Jenkins to prevent the admission of Jenkins' Aryan Brotherhood testimony on redirect examination. Final-

ly, Driscoll contends that the aforementioned trial court errors violated his rights under Amendments 1, 6, 8, and 15 to the United States Constitution, and article I, sections 10, 14, 18(a), and 21 of the Missouri Constitution.

### A.

Driscoll first cites *Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), which stands for the proposition that penalty phase evidence of a defendant's membership in the Aryan Brotherhood and references to that organization as a "white racist prison gang," without more, violates a defendant's First Amendment constitutional rights. This evidence, the Court held, was not relevant to any issue in the case because it "was not tied in any way to the murder of Dawson's victim." *Id.* at 166, 112 S.Ct. 1093. Furthermore, because both Dawson and the murder victim were white, "elements of racial hatred were therefore not involved in the killing." *Id.* The Court also held that in the absence of proof "that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts," the evidence was not relevant to prove any aggravating circumstance or that defendant was a person of bad character. *Id.* at 166–67, 112 S.Ct. 1093. Ultimately, the Court concluded that Dawson's First Amendment rights were violated "because the evidence proved nothing more than Dawson's abstract beliefs." *Id.* at 167, 112 S.Ct. 1093.

Driscoll fails to recognize that the Court's holding in *Dawson* was expressly limited to the facts set out in the parties' brief stipulation, which stated:

The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan

Brotherhood now exist in many state prisons including Delaware.

*Id.* at 162, 112 S.Ct. 1093. The Court repeatedly emphasized that the result likely would have been different if more evidence concerning the unlawful activities of the Aryan Brotherhood had been presented. In this regard, the Court observed that before the penalty hearing, the state claimed that its expert witness would show that the Aryan Brotherhood was a "gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates," *id.* at 165, 112 S.Ct. 1093, and the Court then noted that "[i]f credible and otherwise admissible evidence to that effect had been presented, we would have a much different case." *Id.* The Court added:

> In many cases ... associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.

*Id.* at 166, 112 S.Ct. 1093.

The evidence presented in the case at hand is closer to these examples than to the evidence presented in the *Dawson* stipulation, and it may well be that the United States Supreme Court would come to the same conclusion. Nevertheless, for punishment phase purposes, it is unnecessary to decide the issue definitively.

### B.

Whether the evidence was admissible in guilt phase is quite another question. The holding of *Dawson*—that mere evidence of a defendant's membership in a racist prison gang is a First Amendment violation if not otherwise relevant—appears equally applicable to guilt phase. Driscoll con-

tends that the evidence was not otherwise relevant in guilt phase on the ground that it was pure propensity evidence designed "to portray Driscoll as a person of bad character." The state counters that the evidence was properly admitted to show Driscoll's motive—that Driscoll killed to enhance his stature within the prison system—and to rehabilitate state's witness Jenkins, whose credibility defense counsel called into question during cross-examination. The state concedes, however, that Jenkins' reference to Driscoll's statement that "you have to kill a black man to join" was inadmissible under any theory.

The law is well-settled that evidence of uncharged misconduct is inadmissible if it is offered for the purpose of showing a defendant's propensity to commit crimes. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). However, such evidence may be admitted if it is logically and legally relevant to establish the defendant's guilt of the crime charged. *Id.* Evidence is logically relevant if "it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial," but it is legally relevant only if "its probative value outweighs its prejudicial effect." *Id.* Ultimately, however, the admission or exclusion of evidence is a matter within the sound discretion of the trial court. *Id.*

Applying these principles, this Court concludes that the logical relevance of the Aryan Brotherhood evidence was tenuous at best and that the prejudicial effect of the evidence far outweighed its probative value so that it had no legal relevance. There was no indication that the riot and the murder were racially motivated, nor any other evidence that tied the Aryan Brotherhood or its tenets to the crimes. Furthermore, the argument that Driscoll's motive for killing Officer Jackson

was to improve his standing among the inmates and enhance his status in the Aryan Brotherhood community was bare speculation. Tellingly, the state apparently had so little confidence in the motive argument that it made no attempt to introduce the evidence on direct examination.

On the other hand, the Aryan Brotherhood evidence enabled the state to portray Driscoll as a person of bad character who advocated violent "white power" racism and who chose to associate with an inmate gang professing that belief and whose "way of life" was to "kill and murder all the time." Evidence of this sort is exactly that which the rule against propensity evidence prohibits, and its admission in this case was an abuse of discretion.

### C.

■ As an alternative to motive, the state argues that the Aryan Brotherhood evidence was admissible to rehabilitate state's witness Jenkins, Driscoll's former cellmate, after he had been cross-examined by defense counsel. This argument is directly related to Driscoll's claim that the trial court erred in disallowing Driscoll's attempted waiver of cross-examination. Jenkins had died between the first trial and the second, and, as noted, the transcript of his testimony from the first trial was read into evidence. At the first trial, the Aryan Brotherhood evidence was not introduced until defense counsel opened the door on cross-examination by challenging Jenkins' credibility and, particularly, Jenkins' reluctance to come forward against Driscoll until weeks after the murder was committed. On redirect examination, the state then introduced the Aryan Brotherhood evidence to explain why Jenkins had not come forward with his testimony earlier. There is no dispute that for this limited purpose, the evidence was independently relevant and therefore

admissible. In the second trial, Driscoll anticipated that the state would offer the transcript of Jenkins' testimony and asked the trial judge to excise those portions of the redirect examination relating to the Aryan Brotherhood evidence. When the judge refused, Driscoll announced that he was waiving cross-examination altogether. At that point, the judge disallowed the waiver and permitted the state to read the testimony in its entirety.

■ Neither party has cited cases on point with this unique fact situation, and we have found none. The cases cited relate instead to a defendant's partial waiver of cross-examination or request to excise prejudicial parts of the cross-examination. The holdings in these cases are that cross-examination must be read in its entirety to avoid confusion, but these holdings are not pertinent where there is an attempt to waive cross-examination in its entirety, which eliminates the possibility of confusion altogether. In addition, Driscoll misidentifies the issue by reference to the Sixth Amendment right to confront witnesses, even though the Sixth Amendment does not speak to any right *not* to confront witnesses. Driscoll's better argument, which he raises alternatively, is that he has a right to present his case according to his chosen trial strategy so long as he stays within the bounds of the rules of evidence and procedure. In this connection, it has long been held that cross-examination of the state's witnesses is always a strategic decision to be made at defendant's election. *See Diaz v. United States*, 223 U.S. 442, 451, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (holding that defendant has the right to waive confrontation of a witness). *See also* 21A Am.Jur.2d *Criminal Law* sec. 1183 (2000). As the state concedes, "if a witness testified in court and the opposing party chose not to cross-examine, there can be no doubt that the proponent of the

witness could not conduct a redirect examination." *See* 1 JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE 119 (5th ed.1999). The variation present in this case, however, as the state points out, is that the evidence consists of prior recorded testimony of an unavailable witness of whom the cross-examination and redirect examination had already occurred.

This argument would be more tenable had the testimony in question been admissible in the direct examination as well as redirect. That is not the case, of course, because the testimony was propensity evidence that for guilt phase purposes could only be admitted on redirect examination to rehabilitate the state's witness after cross-examination. In the absence of case law one way or the other, the defendant's right to present the case according to his chosen trial strategy, which is in the nature of a due process right, trumps the hardship to the state due to the fact that its witness was no longer available. Accordingly, it was an abuse of discretion to admit the Aryan Brotherhood evidence on redirect examination after the defendant's waiver of cross-examination.

### D.

■ The prejudicial effect of the erroneously admitted evidence remains to be determined. In most cases of trial court error, the issue is whether the evidence was "outcome determinative," that is, whether "the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *State v. Barriner,* 34 S.W.3d 139, 150 (Mo. banc 2000). In this case, however, the error was compounded by the fact that the propensity evidence was also a First Amendment violation. Having determined that the *Dawson* analysis logically applies to guilt phase, the erroneous introduction of the Aryan Brotherhood evidence, when stripped of any independent relevance, was an error of constitutional magnitude. As such, the judgment of guilt can be affirmed only if it is shown that the error was harmless beyond a reasonable doubt. *Dawson,* 503 U.S. at 166–67, 112 S.Ct. 1093; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As the Supreme Court more recently has instructed, "the test for determining whether a constitutional error is harmless ... is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,'" and further, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Neder v. United States,* 527 U.S. 1, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

■ Under this heightened standard, the state has failed to show that defendant was not prejudiced. That is not to say that the state did not make a submissible case. The evidence of Driscoll's guilt was substantial, and much of it was uncontroverted. For instance, Driscoll confessed to stabbing a correctional officer with a knife he had assembled, and he was one of the inmates who rushed the control center. In addition, and of critical importance on the issue of deliberation, the stabbing occurred while Officer Jackson was being held from behind by "Hog" Roberts. Much other evidence was introduced that warranted strong consideration by the jury, though the evidence was not uncontroverted. In that regard, one guard and two inmates observed Driscoll stab Jackson repeatedly, and Driscoll bragged to

inmate Jenkins that he had "killed the freak" and to another inmate that he had "take[n] him out."

Driscoll's defense was to identify a variety of inconsistencies in the physical evidence and the testimony of several state's witnesses and to impeach the credibility of those witnesses. The goal was to establish 1) that the murder may have been committed by Rodney Carr, one of the other inmates who also stabbed Jackson during the melee, or some unidentified inmate, and 2) that even if Driscoll stabbed Jackson, he did not deliberate. On the latter issue, suffice it to say that whoever stabbed Jackson did so while "Hog" Roberts held Jackson from behind and pinned his arms back while the stabbing occurred, and that fact alone refutes any reasonable theory of lack of deliberation. *See State v. Mallett,* 732 S.W.2d 527, 533 (Mo. banc 1987), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987) (holding that a murder that occurred while victim incapacitated established deliberation). The more difficult question is whether Driscoll was the other inmate who stabbed Jackson, or rather whether one or more jurors could entertain a reasonable doubt that Driscoll was the other inmate who stabbed Jackson.

To address this question, this Court has made careful review of the whole record, keeping in mind that the state was not entitled to the benefit of all reasonable inferences from the evidence, as in a review for the sufficiency of the evidence.

Driscoll's attempt to interject doubt in the case centered on five points:

First, three guards other than Jackson were stabbed, which raised the possibility that Driscoll, who admitted stabbing an officer but "did not know who the officer was," may not have been the inmate who stabbed Jackson.

Second, Officer Halley, the prison guard who testified that he saw Driscoll stab Jackson, had testified on several prior occasions that he had not seen Driscoll stab Jackson.

Third, within days of the riot, two other prison guards, Officer Hess and Officer Wilson, made written statements that they had seen Rodney Carr stab Jackson in the chest.

Fourth, one of the two inmates who testified that Driscoll stabbed Jackson in the chest, and both inmates who testified to Driscoll's incriminating remarks, made no mention of that evidence in the written statements they gave to the authorities soon after the riot. In addition, on cross-examination, defense counsel brought out a number of inconsistencies in the details of the inmates' testimony, as well as the possibility that at least two of the three inmates would be given favorable treatment in return for their testimony.

Fifth, the knife identified as Driscoll's, which had been dropped on the prison floor during the riot and retrieved by one of the guards, had bloodstains of Type A blood, but there were no stains of Jackson's blood, which was Type O.

The state's evidence contradicting these points, other than that mentioned before, was 1) that soon after Officer Hess and Officer Wilson made the written statements that they had seen Rodney Carr stab Jackson in the chest, they retracted the statements, and they later testified that they had seen Rodney Carr stab Jackson in the stomach rather than the chest; 2) that the reason the two inmates did not implicate Driscoll in their original statements was that they had not yet been placed in protective custody and they feared for their own lives; and 3) that the discrepancy with the blood evidence on the knife was due to the likelihood that Driscoll not only stabbed Jackson but also

Officer Maupin, who was bleeding profusely and who did have Type A blood, and further, that any blood from Jackson was likely wiped off the knife when the officer who retrieved the knife stuck it in his trousers.

Although it is a close case, and though the evidence clearly constitutes a submissible case, this Court concludes that a reasonable juror could harbor reasonable doubt. Given the inconsistent testimony by the guards and the inmates and the absence of the victim's blood on the knife, the theory of the defense that Driscoll stabbed someone other than Jackson was plausible, if not probable.

Ultimately, the question is whether the jury would have convicted Driscoll in the absence of the Aryan Brotherhood evidence. Despite the fact that the prosecutor made no reference to the evidence in the guilt phase closing argument, it was highly prejudicial, and in view of the plausibility of the theory of the defense, the Aryan Brotherhood evidence may well have been sufficient to convince one or more of the jurors to convict rather than acquit. This Court cannot say with confidence that the error complained of did not contribute to the verdict, and for that reason this Court cannot hold that the constitutional error was harmless beyond a reasonable doubt.

## CONCLUSION

The judgment is reversed, and the case is remanded for new trial.

All concur.