**STATE of Missouri, Respondent,**

v.

**Darris Arlando PEAL, Appellant.**

**No. WD 74527.**

Missouri Court of Appeals,
Western District.

March 19, 2013.

Jessica P. Meredith, Jefferson City, MO, for respondent.

Emmett D. Queener, Columbia, MO, for appellant.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

Darris Peal ("Peal") appeals from the trial court's judgment convicting him of second degree (felony) murder after a jury trial. Peal claims that the trial court abused its discretion in allowing the State to introduce: (1) a video recording of Peal extracted from Peal's cell phone, (2) evidence that Peal was unemployed, and (3) a photo display of booking photographs of Peal and others with whom he was alleged to have acted in concert, because all of the aforesaid evidence had no relevance other than to improperly show Peal's propensity to commit the crimes with which he was charged. We affirm.

**Factual and Procedural History**[1]

On October 22, 2010, Aaron Hobson ("Hobson") and five friends including

---

1. We view the facts in the light most favorable to the verdict. *State v. Brand,* 309 S.W.3d

Floyd Morgan ("Morgan") traveled from Kansas City to Columbia to watch Hobson's cousin play a University of Missouri football game. The group attended a party at the Peach Tree event center. Hobson drove with Morgan to the Peach Tree in his vehicle, a black Impala with "Lamborghini" doors that opened vertically and large 24-inch rims. During the party, Hobson was flashing money.

After the party, Hobson and Morgan drove around the Peach Tree parking lot "stunting," which consisted of driving around with the car doors up and flashing money in order to get attention. At some point, Hobson's group got separated, and planned by cell phone to meet at a nearby Break Time gas station.

At approximately 1:15 a.m., Hobson and Morgan pulled into the busy Break Time parking lot. As Hobson entered the lot, the doors to his vehicle were up. Hobson had money in his hand. A group of men rushed the driver's side of Hobson's vehicle. One of the men pointed a gun at Hobson. Hobson threw the money at Morgan. Morgan fell out of the vehicle and ran. Hobson was pulled out of his vehicle and held with a gun to his head at the back of his vehicle. Some of the men collected the money falling out the side of his vehicle, and others beat Hobson and went through his pockets. Eventually, Hobson got back into his vehicle. Someone in the group of men yelled, "Shoot the n* * * * *." Gunshots were fired, and everyone fled. Hobson's vehicle rolled up on to the curb and came to a stop. Hobson's friends returned to Hobson's vehicle and found Hobson slumped over and semi-conscious. When the police arrived, Hobson no longer had a pulse. Hobson was transported to the hospital where he was declared dead from two gunshot wounds.

A police search of Hobson's vehicle revealed $374 cash in the glove box. No weapons were found. At the scene, police collected two spent shell casings and a bullet fragment. A .22 caliber pistol was found in the parking lot of a business behind Break Time. The following day, the police collected two more spent shell casings from a nearby business. The police later obtained surveillance video of the Break Time parking lot. Peal was identified in the video.

On October 23, 2010, a complaint was filed against Peal. On October 27, 2010, Peal was arrested in Jennings, Missouri. Once in custody, Peal gave a videotaped statement to Columbia Police Detective Joseph Jackson ("Detective Jackson"). Detective Jackson testified that Peal told him he had gone to the party at Peach Tree on October 22, 2010, but never went into the party. Peal also told him that he then went to Break Time. Peal admitted that he was involved in the altercation at Hobson's vehicle, but claimed he was only protecting his nephew, Patrick Marshall. Peal told Detective Jackson he did not know, or barely knew, most of the men identified in the surveillance video as involved in the altercation[2] with Hobson. Peal denied seeing a gun during the altercation. Peal denied owning a cell phone.

A vehicle associated with Peal was towed for processing. The vehicle inventory resulted in the discovery of two cell phones with the numbers 573–356–9785 and 573–356–9786, and identification and receipts with Peal's name and contact information including the phone number

887, 890 n. 2 (Mo.App. W.D.2010).

**2.** From the video surveillance tape, Detective Jackson identified Peal, Daron Peal, Jerel Bryant, Sanchez Callaway, Anthony Carr, Lee Carter, Deshon Houston, Earl Johnson, Tony Lewis, Patrick Marshall, Leo Roland, and Dmetrius Washington.

573–356–9786. On October 28, 2010, Deputy Dustin Richards booked Peal into the Boone County jail. At that time, Peal reported his phone number to be 573–356–9786.

On December 2, 2010, the gun used to shoot Hobson was recovered from Jerel Bryant, one of the men identified in the video surveillance tape. The gun was matched to the spent shell casings and bullet fragment obtained from the Break Time parking lot, to the bullet retrieved from Hobson's body, and to the spent shell casings found on the nearby business parking lot.

On June 24, 2011, Peal was indicted as a persistent misdemeanor offender[3] with two alternative counts of the class A felony of second degree (felony) murder.[4] As to count one, it was alleged that Hobson was killed by Peal acting in concert with another as a result of immediate flight from perpetration of the class B felony of robbery in the second degree. As to count two, it was alleged that Hobson was killed by Peal acting in concert with another as a result of immediate flight from perpetration of the class C felony of felonious restraint.

Following a jury trial, Peal was found guilty of second degree (felony) murder with robbery in the second degree as the predicate felony offense. Peal was sentenced to twenty-five years in the Missouri Department of Corrections. Peal filed a motion for new trial which was denied.

Peal appeals.

## Standard of Review

"The standard of review for the admission of evidence is abuse of discretion." *State v. Freeman,* 269 S.W.3d 422, 426 (Mo. banc 2008). " 'A trial court has broad discretion to admit or exclude evidence at trial.' " *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006) (citation omitted). "The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect." *State v. Oplinger,* 193 S.W.3d 766, 770 (Mo.App. S.D.2006). Abuse of discretion occurs when a trial court's ruling is " 'clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *Freeman,* 269 S.W.3d at 426 (citation omitted). " 'Reversal is warranted only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *State v. Tisius,* 362 S.W.3d 398, 405 (Mo. banc 2012) (citation omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Forrest,* 183 S.W.3d at 224.

## Analysis

### Point I

For his first point on appeal, Peal alleges that the trial court abused its discretion in allowing the State to introduce, over Peal's objection, a video recording of Peal extracted from Peal's cell phone ("the Video"). Peal claims the Video was inadmissible because it was improper character evidence relevant only to show his propen-

---

3. Section 558.016 provides that sentencing may been enhanced for persistent offenders such that the total authorized maximum terms of imprisonment for a persistent offender are for a class A felony, any sentence authorized for a class A felony and for a class B felony any sentence authorized for a class A felony.

4. Peal was also indicted and charged with an additional alternative count of second degree (felony) murder with the predicate felony of robbery in the first degree, with one count of robbery in the first degree, and with one count of felonious restraint. These additional counts were dismissed by the State prior to trial.

sity to commit the crimes with which he was charged. We disagree.

The Video begins with the camera focused on over $200.00 cash displayed on a car seat which Peal sifts through with his fingers before he turns the camera on himself and says, "This ain't nothing but play money, dog. I play with this shit." Peal returns focus on the cash as he sifts through it again, picks it up, and lays it out on the seat. The Video depicts two other people sitting in the front seat of the vehicle as they are driving through traffic. Peal returns the camera to himself and says, "We get money.... Money is the key.... Money is the object.... You can always get money." The driver asks Peal who he is talking to and Peal answers, "The Get Money Team." "Talking to the whole world, get money."

On the second day of trial, out of the presence of the jury, Peal filed a motion in limine requesting that the State be barred from introducing character evidence that Peal is "very greedy and liked money to show he had a propensity to steal." Peal's counsel asserted that based on the State's opening statement, he believed the State would be attempting to introduce the Video to demonstrate that Peal "had some sort of greedy character.... there were references made that he is jobless, that he is poor, that he has [a] greedy character, likes money."[5] Peal's counsel, citing *State v. Driscoll*, 55 S.W.3d 350 (Mo. banc 2001), acknowledged that bad acts evidence is admissible to show motive, but argued that this evidence was purely character evidence with no relevant purpose but to show Peal's propensity to commit the crimes with which he was charged.[6]

The State argued that it intended to offer the Video to establish Peal's motive. The State argued that the evidence demonstrates Peal's obsession with money and thus his motive to rob Hobson. The State also argued that it should be given wide latitude in developing motive in light of Peal's statement to Detective Jackson that he did not know anything about the robbery.

The trial court denied Peal's motion in limine, and noted:

[L]et's say ... you demonstrate it's an obsession or whatever. That extreme behavior as to money, tied with this case where you've got somebody holding a huge wad of cash out a car window, would seem to tie in to show why the defendant may have reacted the way he did when he was in that circumstance at the convenience store.

. . . .

I'll take it with the case. But I think that the issue of acting in concert that the State's trying to put forward, whether they do it successfully or not, who knows, is a subject of the video and thereby relevant. In other words, he is talking about a team, a Get Money Team, and he's with people that are purportedly on the parking lot at the same time he is when the homicide goes down.... But I'll certainly let you make your objection[.]

Later in the trial, and just prior to the State's introduction of the Video into evidence, Peal's counsel requested that the foundation for the Video be laid outside the presence of the jury. The State

---

5. Peal made no objection to these statements.

6. Throughout trial, and on appeal, Peal interchanges character evidence with evidence of prior uncharged bad acts. These categories of evidence are distinct and are not inter-changeable. However, sensitivity exists as to the admission of both categories of evidence given the potential for such evidence to improvidently suggest a defendant's propensity to commit a charged crime.

agreed. At that time, the trial court reiterated that the Video was being admitted for the sole purpose of establishing motive. The trial court expressly stated, "The cases indicate a wide range of evidence has been admitted to prove motive.... *And it's not character. It's not being offered for character. And I wouldn't allow it in for character.*" (Emphasis added.)

The State laid the foundation for the Video outside of the presence of the jury through the testimony of Detective Jeffrey Rukstad ("Detective Rukstad"). The Video was then admitted into evidence over Peal's objection. Detective Rukstad continued his testimony about the Video in the presence of the jury. Detective Rukstad testified that the video was taken from a cell phone with the number 573–356–9786. The Video was played for the jury over Peal's renewed objection.

Detective Rukstad then testified that the person talking on the Video was Peal, that the person driving the vehicle was Anthony Carr (one of the men identified in the video surveillance tape), but that he could not positively identify the other passenger in the car. Detective Rukstad testified that he also obtained photographs from the same cell phone relating to money including a picture depicting four one hundred dollar bills; a picture of a pair of Air Jordan shoes with cash titled "Getting Money"; multiple pictures of cash; a picture entitled "Getting money first name last name"; and multiple pictures of Peal holding money, one of which was entitled "Getting money now" dated October 7, 2010.

Peal argues that the Video was not logically or legally relevant because it was

character evidence or evidence of uncharged bad acts that only tended to show Peal's propensity to commit the crimes with which he was not charged.

■ At the outset, we disagree with Peal's premise. As the trial court noted, evidence about Peal's obsession with money and/or his association with the "Get Money Team" is not character evidence. And facially, the evidence is not evidence of uncharged bad acts or crimes. Rather, the contents of the video merely depict Peal's conduct prior to Hobson's murder, rendering its admission subject only to the traditional rubric associated with relevance.[7] Thus, Peal's efforts at trial to exclude the evidence by characterizing it as something it is not yielded a confusing record, and a disproportionate and largely irrelevant discussion of whether the evidence of Peal's pre-incident fell into an exception permitting admission of such evidence.

Even were we to conclude that the evidence in question could be viewed as either character evidence, or evidence of uncharged bad acts, we would find no abuse of discretion in its admission.

■■ The State is required to try a defendant only for the offense for which he is on trial. *State v. Batiste*, 264 S.W.3d 648, 650 (Mo.App. W.D.2008) (citing Article I, Section 17 and 18(a) of the Missouri Constitution). The State is thus precluded from "unjustifiably introducing evidence of defendant's prior, uncharged crimes or bad acts." *Id.* Similarly, "the State cannot use a defendant's bad character to prove bad conduct in conformity with that character." *State v. Slagle*, 206 S.W.3d 404, 410 (Mo.

---

7. "[O]ffered evidence must be both logically relevant, in that it has some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial, and also legally relevant, in that its probative value outweighs its prejudicial effect." *State v. Winfrey*, 337 S.W.3d 1, 11 (Mo. banc 2011) (quoting *State v. Davis*, 211 S.W.3d 86, 88 (Mo. banc 2006)).

App. W.D.2006) (citing *State v. Oates,* 12 S.W.3d 307, 313 (Mo. banc 2000)); *State v. Aldrich,* 936 S.W.2d 834, 836–37 (Mo.App. W.D.1996) ("Evidence of other crimes or bad acts committed by a defendant is not admissible . if offered for the purpose of showing that the defendant is a person of bad character, and therefore a person with a propensity to commit criminal acts.").

■ However, evidence of bad character or prior bad acts is admissible " 'to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the alleged perpetrator.' " *State v. Winfrey,* 337 S.W.3d 1, 11 (Mo. banc 2011) (quoting *State v. Davis,* 211 S.W.3d 86, 88 (Mo. banc 2006)).

Here the Video was admitted to establish Peal's financial motive for committing the crimes with which he is charged. The evidence was logically relevant for this purpose. In *Winfrey,* our Supreme Court upheld the admission of evidence of a defendant's significant financial stress, a prior break in to steal money, the theft of a car and the passing of bad checks prior to the crimes with which he was charged as logically relevant to establish motive to commit robbery and a related murder. *Id.* Similarly, in *State v. Mayes,* 63 S.W.3d 615, 633 (Mo. banc 2001), our Supreme Court upheld the admission of evidence that a defendant fought frequently with his wife and had been fired from his job prior to his wife's murder as relevant to establish motive as the evidence demonstrated that the defendant suffered marital pressures and financial difficulties.

The logical relevance of the Video is self-evident. Peal had an obsession with obtaining money, a fact that was probative on the issue of Peal's motive for robbing Hobson after he openly flashed cash.

Peal relies on *State v. Driscoll,* 55 S.W.3d 350, 352 (Mo. banc 2001), to argue that the Video was not logically relevant to

establish motive. *Driscoll* is factually distinguishable. Driscoll was convicted of capital murder for stabbing a white corrections officer to death. *Id.* at 351. Evidence that Driscoll was a member of the Aryan Brotherhood was admitted at trial. *Id.* at 352. The testimony was that the Aryan Brotherhood is a white gang, the members of which murder African Americans as a way of life. *Id.* at 352–53. On appeal, the Supreme Court held that the logical relevance of this evidence was tenuous at best and that the prejudicial effect of the evidence far outweighed its probative value rendering the evidence void of legal relevance. *Id.* at 354. The Supreme Court noted that there was no indication that Driscoll's stabbing of the white corrections officer was tied in any manner to his membership in the Aryan Brotherhood. *Id.* at 354. The Supreme Court noted that the evidence of Driscoll's gang affiliation had no relevance other than to establish Driscoll's propensity to murder, rendering it an abuse of discretion to admit the evidence. *Id.* at 355. In obvious contrast, the Video, which demonstrates Peal's obsession with money, is directly linked to the crime of robbery with which Peal was charged.

■ Peal also argues that the Video was not logically relevant to establish motive because it was recorded three to four weeks before the shooting. The video was taken on October 4, 2010, and the shooting occurred nineteen days later. Remoteness of time between prior conduct and the crime with which a defendant is charged is ordinarily only a factor affecting the weight afforded the evidence. *State v. Danikas,* 11 S.W.3d 782, 790 (Mo.App. W.D.1999) (evidence of bruising on the victim two weeks prior to her murder was admissible to establish defendant's motive to murder victim.). "To the extent that the motive evidence is remote, its remote-

ness normally affects the weight attached to the evidence rather than its admissibility ... By itself, the passage of time does not render evidence inadmissible due to remoteness." *State v. Kennedy*, 107 S.W.3d 306 (Mo.App. W.D.2003) (internal citation omitted). Peal's reliance on *State v. Allen*, 274 S.W.3d 514, 522–23 (Mo.App. W.D.2008), where we rejected the State's admission of evidence of drug possession *after* the commission of the crime of robbery, is of no assistance to Peal. In that case, we held that "mere possession of drugs and drug paraphernalia by the accused, four days *after* the crime occurred, cannot by itself establish motive [for robbery]," in the absence of evidence linking the subsequent drug use and the crime charged. *Id.* at 523 (emphasis added). We did not exclude the evidence based on the passage of time, but instead because logical relevance was not otherwise established.

Beyond the bare assertion in his point relied on, Peal does not develop his argument that the Video, though logically relevant, was not legally relevant because its probative value was outweighed by its prejudicial effect. Notwithstanding the absence of argument on the point, we ascertain no inherently prejudicial effect from admission of the Video.

The trial court did not abuse its discretion in admitting the Video into evidence as it was both logically and legally relevant to establish Peal's motive to rob Hobson.

Point One is denied.

### Point II

For his second point on appeal, Peal alleges that the trial court abused its discretion in allowing the State to introduce evidence of Peal's unemployed status. The State offered evidence that Peal was unemployed to establish his motive to commit the crime of robbery. Peal claims his unemployment was relevant only to show his propensity to commit crimes with which he was not charged. We disagree.

As with Peal's first point relied on, the question we must determine is whether the evidence of Peal's unemployed status was logically and legally relevant to establish motive. Here, determining the issue is complicated by the fact that Peal himself offered evidence about his unemployed status.

Deputy Richards testified on direct examination that when he was booking Peal, Peal told him that he was unemployed and had never been employed. Peal registered no objection to this testimony. On cross-examination of Deputy Richards, Peal extracted the same testimony, then objected and moved to strike the testimony. The following exchange occurred:

[Defense Counsel]: And the defendant told you that he didn't have a job?

[Deputy Richards]: Correct.

[Defense Counsel]: And that he never had a job?

[Deputy Richards]: Yeah—correct.

[Defense Counsel]: I'm going to object and ask that that be stricken from the record. I don't know how that's relevant.

The Court: *Well, you just asked it.*

[Defense Counsel]: Well, I don't think it's relevant, and I would ask that you instruct the jury to disregard it.

The Court: Well, ladies and gentlemen, you're instructed to disregard the answer to the question defense counsel just asked. Disregard it. Any further action?

[Defense Counsel]: I'd ask that they disregard the answer to—[Deputy] Richard's answers to the state's questions as well, that he said he didn't have a job. That [Peal] said he doesn't have a job and never had a job.

[The State]: Your Honor, we've already covered that. I'd be happy to speak from here if I can. For the reasons I stated, it goes to—I mean—

The Court: Why don't you come up here just a minute.

----

Counsel approached the bench and the following proceedings were held:

The Court: What happened to objections?

[Defense Counsel]: Well, I mean—

The Court: I mean, for God's sake, object. And if you don't object, don't reask [sic] it and turn around and bring more attention to it by wanting it stricken. Now what were you going to say?

[The State]: It goes to motive. He didn't have a job at the time.

[Defense Counsel]: He's in jail, I think, when this conversation takes place.

[The State]: Never once. Didn't have a job.

The Court: Okay. Well, once again, you need to make your objection, and then don't ask the question again.

[Defense Counsel]: Okay.

The Court: Okay? All right.

----

The following proceedings were held in open court:

The Court: Ladies and gentlemen, you're ordered to disregard and it's stricken from the record the issue of defendant's employment. Okay? Understood?

(Emphasis added.)

Notwithstanding the trial court's curative instruction on the issue of evidence of Peal's status as unemployed, when Detective Joseph Jackson ("Detective Jackson") later testified, the State approached the bench and inquired:

[The State]: May I ask him—he asked about the employment status of the defendant. May I ask him that?

[Defense Counsel]: I'm going to object to the employment status. I don't think it's relevant.

The Court: What's the relevance?

[The State]: It goes to motive. Money. He needed money. Didn't have it.

The Court: Objection will be overruled.

----

The following proceedings were held in open court:

[The State]: Did you ask the defendant about his employment status?

[Detective Jackson]: Yes, Sir.

[The State]: Okay. And what did he tell you with regard to whether or not he had a job at the time you were talking to him?

[Detective Jackson]: He said he was not employed.

During a subsequent break in Detective Jackson's testimony and outside the presence of the jury, the trial court advised counsel that it was going back and forth on the "didn't have a job" issue, acknowledging that it had ultimately allowed the evidence in on the issue of motive through Detective Jackson's testimony. The trial court advised the parties that:

It does appear that from a motive standpoint, it would be admissible. I haven't gotten any case law from either side on this. But in any event, I'm telling the state, while that evidence has been admitted through Detective Jackson that he didn't have a job, I don't want you hitting on that during closing. It's in evidence.

The State complied with the trial court's directive and did not mention Peal's unemployed status in closing argument.

In his motion for new trial, Peal alleged that the trial court erred in allowing evidence that he was unemployed and had never been employed as said evidence was neither logically nor legally relevant. The motion was denied by the trial court. On appeal, Peal has abandoned his claim of error with respect to evidence that he had never been employed, and complains only about the admission of evidence that he was not employed at the time of his arrest.

Though Peal summarily asserts that admission of evidence of his unemployed status was erroneous, in his brief he develops his argument only by highlighting the trial court's inconsistent handling of the admission of the evidence to establish motive, and by arguing that once admitted, the bell could not be unrung. Peal ignores, however, that he was equally responsible for the admission of evidence of his unemployed status. If the bell was rung, it was rung as resoundingly by Peal as it was by the State. Error in the admission of evidence invited by a defendant cannot form the basis of a claim of trial court error on appeal. *See State v. McFall*, 737 S.W.2d 748, 756 (Mo.App. S.D.1987); *State v. Mayo*, 680 S.W.2d 231, 232 (Mo.App. E.D. 1984).

Moreover, though the trial court initially instructed the jury to disregard evidence of Peal's unemployed status (notwithstanding that the evidence was admitted in part through Peal's cross examination), it later changed its ruling and determined to admit the evidence. The trial court then mitigated any confusion inherent in its inconsistent rulings by instructing the State not to argue Peal's status during closing. Peal fails to advance any authority to support a claim that the trial court's change of heart with respect to the admissibility of evidence of Peal unemployed status during Detective Jackson's testimony was erroneous. In any event, for reasons already

adequately explained in our discussion of Point One, we agree with the trial court's ultimate conclusion that the evidence of Peal's status as unemployed was logically and legally relevant to establish motive given the facts and circumstances of this case. Peal's unemployment coupled with his obsession for money and his role in the "Get Money Team" are collectively probative to demonstrate that Peal had a motive to rob Hobson in concert with others. The trial court did not abuse its discretion in admitting evidence of Peal's unemployment.

Point Two is denied.

### *Point III*

 For his third point, Peal alleges that the trial court abused its discretion in allowing the admission of a photo display of booking photos of Peal and other men who were in the group at Break Time at the time of the shooting. Peal once again asserts that the booking photos were inadmissible evidence designed to establish Peal's propensity to commit crimes with which he was not charged. We disagree.

At trial, before the State sought to offer the photo display, Peal raised an objection to the anticipated exhibit out of the hearing of the jury. The photo display included full face, and in profile, booking photos of Peal and the others with whom he was accused of acting in concert. The booking information was redacted, but nicknames of the men did appear above the applicable photos. Peal claimed that the booking photos were not legally relevant, as they encouraged impermissible character inferences and were unduly prejudicial. Peal also objected to the inclusion of nicknames above the photos. The following exchange occurred between the trial court and defense counsel:

> The Court: I don't understand how that is character evidence.

[Defense Counsel]: [I]t may not be character evidence of the defendant. This is a booking photo at the time of his arrest. But to say, 'Here's booking photos of everybody who was at the scene of the crime' is essentially saying that you know, 'You should count all of these booking photos, all of these potential offenses, against Darris Peal.' And that's——it's just not legally relevant.... It's overly prejudicial. It's more prejudicial that it is ever probative .... that's the standard for evidence here: Is it legally relevant. How is this legally relevant?

The Court: The charge is acting in concert.

Defense counsel continued to argue that the booking photos of the other men were prejudicial, and then requested, at a minimum, that the profile shot of each individual be removed. The State agreed to remove the profile shot and agreed not to adduce testimony identifying the pictures as booking photos. The trial court then noted:

The Court: Okay.... That may be a job, but it sounds like that's reasonable, given that really all—— it sounds like all you need is the front shot.

[The State]: Yeah, that would be fine. We could do that.

The Court: It takes out the—I'm not sure there's anything necessarily prejudicial to the defendant with respect to identifying them in booking photos, but, that being the case, if you could give just one photo of each guy.

[The State]: Yeah.

[Defense Counsel]: Well, we would like the front facial shot, Your Honor.

[The State]: That's fine.

The Court: Yeah. The front.... And that they not be referred to as booking photos.

[The State]: Correct.

The Court: And you're telling us that there will be evidence adduced that all these guys were on the lot.

[The State]: Yes.

The Court: And they're the subject of the others he acted in concert with.

The Court never rendered a ruling on Peal's original objection to the photo display in light of the State's agreement to remove the profile photos and to refrain from characterizing the pictures as booking photos. *See State v. Smith,* 744 S.W.2d 476, 478 (Mo.App. W.D.1987) ("By failing to obtain a ruling on his objection, the objection is deemed to have been abandoned.").

Later, when the State sought to offer the revised photo display into evidence through the testimony of Detective Jackson, Peal's counsel responded "no objection." The trial court admitted the exhibit. Defense counsel then immediately stated:

[Defense Counsel]: Well, hold on. I previously had objected to the ... nicknames on there. I'd renew my motion in limine.

The Court: On the nicknames?

[Defense Counsel]: Yeah.

The Court: Okay. Objection will be overruled. [Exhibit] admitted.

Thus, the only objection arguably preserved at trial was the objection to inclusion of nicknames on the photo display.

On appeal, Peal has not objected to admission of the photo display on the basis of its inclusion of nicknames. He has only objected to the admission of the photo display because of his claim that the exhibit was not legally relevant as it was unduly prejudicial in suggesting a propensity to commit the crimes with which he was charged. Yet at trial, as to this objection, counsel reached a resolution which resulted in the State's alteration of the exhibit

and its subsequent admission with Peal's affirmative indication of "no objection." "When a party affirmatively states that it has no objection to evidence an opposing party is attempting to introduce ... plain error review is unavailable." *State v. Mead,* 105 S.W.3d 552, 556 (Mo.App. W.D. 2003).

 In any event, it is settled that:

With respect to police photographs, in *State v. Tivis,* 933 S.W.2d 843, 847 (Mo. App. W.D.1996), this court recognized that '[p]olice photographs, including 'mug' shots, are considered neutral and do not, in and of themselves, constitute evidence of other crimes where inculpatory information is masked.' '[T]he mere fact that a police department previously had on file a photograph of a defendant does not lead to the inference that the defendant has committed prior crimes.' *Id.* at 846. '[Police photographs] are readily admissible into evidence where all identifying information is masked, where a defendant's identity is in issue and where admission of the [police photographs] will help a jury to determine the accuracy of the identification. The admission of a [police photograph] constitutes prejudicial evidence of other crimes *only when the [police photograph] or accompanying testimony discloses a defendant's prior arrests or convictions.' Id.* at 847.

*State v. Carr,* 50 S.W.3d 848, 856–57 (Mo. App. W.D.2001) (emphasis added).

Point Three is denied.

---

8. Peal states that he first became aware of this gun in December 2011, when counsel for co-defendant Tony Lewis spoke with the owner of Providence Urgent Care about the preparations for Lewis's upcoming trial at a social event.

## Motion to Remand for a New Trial or Hearing on Newly Discovered Evidence

 While this appeal was pending, Peal filed a motion to remand for a new trial, or in the alternative, for a hearing due to newly discovered evidence. We took the motion with the case.

It was adduced at trial that the gun used in the shooting was recovered from the possession of Jerel Bryant, one of the men with whom Peal was accused of acting in concert. That gun was matched to shell casings and a bullet fragment taken from the scene and a nearby parking lot, and to the bullet retrieved from Hobson's body.

 On April 2, 2011, a nurse employed at Providence Urgent Care, a business located three hundred feet away from Break Time, found a gun wrapped in a washcloth and buried under mulch in front of the business. Neither the State nor defense counsel was aware of this discovery until after Peal was sentenced.[8] Peal argues that this evidence was so material that it likely would produce a different result at a new trial in that the presence of this other gun would have provided a theory of self-defense or defense of others because there was evidence that three or four shots were fired at the Break Time, and witnesses reported that it sounded as if shots were coming from different directions and from different caliber guns.

[Peal's] motion is not within the time limits for filing a motion for a new trial pursuant to Rule 29.11(b) because that limit is 25 days after the verdict.[9] Once the time for filing a motion for a new

---

9. Rule 29.11(b) requires a motion for a new trial to be filed within 15 days after the verdict is returned. Upon application of the defendant within those 15 days and for good cause shown the court may extend the time for filing the motion for an additional period not to exceed 10 days.

trial has passed, the Missouri rules have no provision for the granting of a new trial based on newly discovered evidence even if the evidence is available prior to sentencing.[10] Additionally, new evidence that is not in the record should not be considered on appeal. Generally, this Court will not remand a case before an appeal is concluded if the lone fact of newly discovered evidence is not enough to grant a new trial. But an appellate court has the inherent power to prevent a miscarriage of justice or manifest injustice by remanding a case to the trial court for consideration of newly discovered evidence presented for the first time on appeal. An appellate court will exercise this power in its discretion.

*State v. Terry*, 304 S.W.3d 105, 108–09 (Mo. banc 2010) (internal citations omitted).

▮▮ To obtain a new trial on the basis of newly discovered evidence, Peal must show:

'1. The facts constituting the newly discovered evidence have come to the movant's knowledge after the end of the trial; 2. Movant's lack of prior knowledge is not owing to any want of due diligence on his part; 3. The evidence is so material that it is likely to produce a difference [sic] result at a new trial; and 4. The evidence is neither cumulative

only nor merely of an impeaching nature.'

*Id.* at 109 (citation omitted).

In light of this standard, Peal's motion is without merit. Here, even assuming the first two prongs set forth in *Terry* are satisfied, Peal has not demonstrated that the evidence of a second gun found near the scene several months after the crime is so material that it is likely to produce a different result at new trial, or that the evidence is not merely cumulative.[11]

First, beyond the bare fact that it was found in the same general area, there is no evidence or allegation connecting this gun to the shooting of Hobson. In contrast, the gun was found at least five months after the shooting by a nurse, Haley Saalborn ("Saalborn"), who was picking up trash around the urgent care business where she was employed. The gun was wrapped in a washcloth and buried in mulch in front of the business. Saalborn testified that she had worked at the urgent care since the business opened in July 2009, and that all employees would pick up around the outside of the business on a regular basis. Saalborn testified that since July 2009, she had herself picked up trash around the premises on a regular basis. Saalborn testified that she found the gun in an area where she and other employees would have been picking up trash on a regular basis since July 2009. This evidence suggests the gun had not

---

**10.** The Federal Rules of Criminal Procedure allow for a motion for a new trial based on newly discovered evidence to be filed within three years of the verdict. Rule 33(b)(1). The rule further states that "[i]f an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case." *Id.* As such, the federal rules specifically allow an appellate court to remand the case based on newly discovered evidence. Missouri's rules do not have this provision.

**11.** The State cites *State v. Newman*, 605 S.W.2d 781, 786 (Mo.1980), for the proposition that self-defense is not a defense to homicide committed in the perpetration of robbery or other felony. However, the rationale in *Newman* was based on MAI–CR 2d. Since *Newman*, MAI–CR 3d provides a separate instruction for self-defense and its Notes on Use do not preclude a self-defense instruction for felony murder, thus the rationale in *Newman* is no longer viable. See *State v. Starr*, 998 S.W.2d 61, 65 (Mo.App. W.D.1999).

been "hidden" in the mulch undiscovered for over five months.

Second, Peal fails to demonstrate how the gun found several months after Hobson's murder is so material that it is likely to produce a different result at a new trial. Peal summarily argues that had he known of the gun's existence, he would have pursued a theory of self-defense or defense of others. Yet, nothing prevented Peal from pursuing that defense at trial. He did not do so. Instead, he advised officers he knew nothing of a gun or a robbery attempt, and was involved in the altercation only to look out for his nephew.

Third, Peal fails to demonstrate that the evidence of another gun is not merely cumulative. At trial, other evidence was adduced about the presence of at least two other guns at or near the scene. Dexter Faulk, one of Hobson's friends, testified that he had a gun with him in his trunk at the time of the shooting, but did not retrieve it because he did not want to engage in a shootout. Peal concedes that a .22 caliber pistol was found in the parking lot of a business behind the Break Time as a part of the investigation into Hobson's murder, but dismisses its presence because that gun had a nine shot capacity and was fully loaded when it was found. Peal does not explain how the gun found at the urgent care center would or could provide a defense when two other guns linked to the scene did not.

Peal has not established the basis for a new trial presuming his motion for new trial had been timely filed. Nor are we persuaded by this record that remand to the trial court to consider Peal's motion for new trial is warranted to prevent a miscarriage of justice or manifest injustice. The circumstances of his case do not support the exercise of our discretion to grant the extraordinary relief of remand of this case to the trial court. Peal's motion is denied.

## Conclusion

We affirm the trial court's judgment.

All concur.